## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00148 (JEB)** |
| **v.** | : | |
| | : | |
| **DEREK JANCART,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Derek Jancart to four months' incarceration and $500 in restitution.

### I.      Introduction

The defendant, Derek Jancart, an Air Force veteran, and his codefendant, Erik Rau,[1] participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Derek Jancart pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. As explained herein, a substantial jail sentence is appropriate in this case because (1) the defendant prepared for violence by bringing a gas mask and two-way radios to Washington, D.C.; (2) he was aware of the potential for violence because he responded

---

[1] Separately charged in *United States v. Rau*, 21-cr-467, and also scheduled to be sentenced on September 29, 2021.

1

to the Capitol only after hearing it had been "breached"; (3) he laughed and cheered while the forward line of the rioters broke through the police line and posted a video to Facebook of Rau screaming "we have you surrounded" at the police officers attempting to hold the line around the Capitol; (4) he penetrated the U.S. Capitol all the way to the Speaker's conference room; (5) his statements on Facebook after January 6 reveal a total lack of remorse; (6) he actively spread propaganda on social media by falsely downplaying the violence on January 6; (7) he likely destroyed evidence by deleting videos and message threads from his phone; and (8) his social media statements reveal he believes a revolution is coming and suggest the possibility of future violence by this defendant.

The government recognizes that Derek Jancart did not personally engage in violence or property destruction and that he accepted responsibility early. However, prior to entering the U.S. Capitol on January 6, Jancart encouraged and celebrated the violence of that day, with Jancart posting a video to Facebook of the attack on the U.S. Capitol where Erik Rau can be heard screaming "we have the police surrounded!" and "we have you surrounded!" while other rioters stormed the stairs of the Capitol and other rioters can be heard screaming, "traitors gonna hang!" Jancart and Rau then advanced on the Capitol, entering through the Senate Door exactly five minutes after an adjacent window was first breached by a rioter smashing through it with a stolen riot shield. They walked past the shattered glass and penetrated the U.S. Capitol until they arrived at Speaker Pelosi's conference room where Rau overheard another rioter shouting to "shit on her desk." Undeterred by that behavior, they continued deeper into the U.S. Capitol until finally a police officer explicitly directed them to leave and bodily placed her hands on Rau's backpack to direct him out of the Capitol.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification combined with the defendant's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse, and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Derek Jancart's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Derek Jancart and Erik Rau traveled to Washington, D.C., from their homes in Ohio to attend the "Stop the Steal" rally. They were prepared for possible violence. Derek Jancart brought a gas mask. *See* ECF 21 at ¶ 8. Rau brought a medical kit and Kevlar-lined gloves. Jancart also brought two-way radios. On January 5, 2021, Jancart posted to Facebook "Anyone know the laws on pick axes in D.C.?" alongside a photo of a pick ax.

After attending the former President's rally, Jancart and Rau returned to their hotel room. According to a post-arrest interview of Jancart, they left the hotel room after receiving an alert that

the "Capitol had been breached." Jancart and Rau joined the crowd advancing on the U.S. Capitol. Along the way, at 1:11 PM, Jancart posted to Facebook, "Little sniper coverage" along with several pictures of D.C. area buildings with one or two figures on the roof.

Jancart and Rau watched from the West Lawn while rioters broke through the police line and rushed up the stairs of the U.S. Capitol. Rau video-taped the moment and can be heard screaming on the video, "We made it up to the Capitol. . . . We have the police surrounded! We have you surrounded!" *See* Exhibit 1. In the background of the video, rioters can be heard screaming, "get him!" and "traitors gonna hang!" When the rioters broke through the police line, Rau can be heard screaming in celebration, "Go, Go, Go!" and "Yeah! They just pushed through the guards!" *Id*. Jancart later obtained that video, presumably from Rau, and posted it to Facebook.

Rau and Jancart than approached the Capitol where, per the proffer with Rau, they used a bicycle rack that was propped on its side to scale a wall. Shortly thereafter, Jancart and Rau entered the Capitol Building through the Senate Door exactly five minutes after the window immediately adjacent to the door was smashed out using a riot shield. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass:



Exactly five minutes after the entry depicted above, Jancart and Rau entered the U.S. Capitol through the Senate Door.[2]



They turned to the right and walked past the shattered glass on the floor from the smashed-in window. From there, Jancart and Rau traveled through the Crypt. *Id.* at ¶ 10.



---

[2] Jancart and Rau both claimed to have been waved in by a police officer at this entry point, but the government has identified no evidence supporting this claim.

After exiting the Crypt, Jancart and Rau took the stairwell south of the Crypt to the second floor of the Capitol and walked towards the Speaker's conference room. Rau stepped inside of the Speaker's conference room while Jancart stayed outside and took a photo. *Id.* at ¶ 10. Rau stayed inside the Speaker's conference room for approximately 15 seconds. During a voluntary proffer with the government, Rau admitted to hearing rioters in the Speaker's conference room discussing breaking into glass cabinets and taking everything in it and hearing a rioter screaming to "shit on her desk."



Jancart then posted the photo of the door to the Speaker's conference room to Facebook with the caption, "We're In[.]" *Id.* at ¶ 11.



Jancart and Rau then walked through Statuary Hall. After leaving Statuary Hall, Jancart and Rau walked past the entrance to the House Chamber and exited through a Southeast exit of the Capitol only after being instructed by officers to leave. *Id.* at ¶ 12. The footage below shows Jancart gesticulating to a police officer while another officer bodily pushes Rau to an exit.



In total, Jancart and Rau spent nearly 40 minutes inside of the Capitol. Both Jancart and Rau have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Social Media Posts*

After the attack on the Capitol, Jancart used Facebook to spread false propaganda that the attack was "peaceful[,]" comparing the riot to an "unscheduled tour." He also compared the attack on the Capitol to Black Lives Matters protests and repeatedly claimed that police officers let the rioters in, despite having watched the mob break through the police line. However, Jancart also admitted on Facebook to having "stormed the Capitol[,]" and to knowing the police had deployed tear gas. Jancart explained that the rioters "wanted to let the politicians know we can get this far anytime we want[.]" A selection of Jancart's statements on Facebook relating to his participation in the riot are summarized below.

On January 6, 2021 at 5:24 PM,[3] Jancart posted to Facebook, "Just so all of you know the people who stormed the capitol were NORMAL everyday people. There were old ladies and people in business suits. Don't believe the LYING media."

On January 6, 2021 at 6:14 PM, Jancart commented on a post and stated, "It was peaceful, there were a few overzealous cops but most of the cops stepped right to the side and didn't bother them."

On January 6, 2021 at 6:27 PM, Jancart replied to a comment and stated, "dude there were old ladies and people in business suits in there. The idea that this was a bunch of crazy kids

---

[3] Times are converted from UTC.

or criminals that stormed the capitol is absolutely bullshit. It was normal everyday people of all backgrounds, ages, races, sexes, and orientations."

On January 6, 2021 at 6:35 PM, Jancart replied to a comment and stated, "we were right down the hall from the girl when they shot her. We weren't breaking anything or anything, just an unscheduled tour."

On January 6, 2021 at 6:43 PM, Jancart posted a photo and stated "This was the capitol in June during the BLM rally. Spare me your faux outrage."

On January 6, 2021 at 7:27 PM, Jancart sent a message to another Facebook user stating, "I'm good we are just back at the hotel now, the state police rolled in deep earlier into the city *after we stormed the capitol*." (emphasis added).

On January 6, 2021 at 7:43 PM, Jancart sent a message to another Facebook user stating, "The news media is over blowing it. They just wanted to let the politicians know we can get this far anytime we want, stop ignoring us."

On January 6, 2021 at 7:48 PM, Jancart boasted to another Facebook user that "we were first 50-100 people in the place [.]"

On January 6, 2021 at 7:50 PM, in a conversation with another Facebook user, Jancart stated "Yea they were trying to tear gas people but it didn't deter too many people lol." On January 7, 2021 at 6:27 PM, Jancart then told the same Facebook user, "I don't condone breaking anything or hurting anyone yesterday. That wasn't the purpose of what the absolute vast majority were there do to. Like 99.7%[.]"

On January 6, 2021 at 8:11 PM, Jancart replied to posts by another user, stating "they are literally stealing this country, they can get fucked" and "eh the cops were letting people in so I don't know how they can be all that pissed[.]"

On January 7, 2021 at 10:54 AM, Jancart sent a message to another Facebook user stating, "The media played all of you, it was literally everyday people who went in yesterday, every class, race, age, back ground, you name it. I never knew how bad the media really was until the reporting yesterday. What a disgrace. And the cops waived us in btw." Jancart sent a follow-up message to the same user and stated, "Glad to see they have time to investigate actual patriots but they can't investigate our new president and his son selling this country down the drain to every foreign power around the world. That should tell you all you need to know about your government[.]"

On January 8, 2021 at 12:08 PM, Jancart told another Facebook user, "I was as peaceful a protester as one can be. Other than maybe "trespassing" on public grounds I've sent literally hundreds of thousands of dollars to over my lifetime."

On January 10, 2021 at 12:08 AM, Jancart told another Facebook user, "I would like to keep my job at least until the revolution starts[.]" In response to the Facebook user's statement that "I hope it doesn't happen!" Jancart responded, "Yeah I hope not too. Honestly I think it's 50/50. Although better to get it over with sooner than later, it's always harder later."

*Derek Jancart's Interview*

Jancart voluntarily agreed to an interview with the FBI at the time of his arrest. During the interview, Jancart protested that he had a right to be there because he paid taxes, stating, "if you guys are going to call me walking in a place where I spend $40,000 a year upkeeping then fine, I trespassed." *Interview of Derek Jancart* at 9:28-9:36. Jancart also claimed that police officers waved them into the building.

*The Charges and Plea Agreement*

On February 22, 2021, Derek Jancart was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On February 23, 2021, he was arrested at his home in Ohio. On February 23, 2021, Derek Jancart was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 23, 2021, he pleaded guilty to Count Three of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Building. By plea agreement, Derek Jancart agreed to pay $500 in restitution to the Department of the Treasury.

## III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

11

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Jancart was prepared for violence when he traveled to Washington, D.C. He brought a gas mask, two-way radios, and posted on Facebook about whether axes were allowed in the city. Erik Rau brought Kevlar-lined gloves and a medical kit. These facts are important as they show a substantial amount of preparation for violence by both Derek Jancart and Erik Rau.

When Jancart and Rau descended on the Capitol, they knew that it would be violent. They traveled to the U.S. Capitol Building from their hotel room only after learning that the Capitol had been "breached." And, on the way to the Capitol, Jancart posted photos of the surrounding buildings with the caption, "Little sniper coverage[.]" The decision to converge on the Capitol after learning that it has been "breached," coupled with Jancart's contemporaneous Facebook posts advertising that there was "[l]ittle sniper coverage" clearly reveals their intent in traveling to the Capitol after the rally.

As an Air Force veteran, Jancart was well aware of the great jeopardy posed by violent entry into the Capitol by the rioters and Jancart was also aware of the violence required to make that entry into the Capitol. Jancart and Rau incited and celebrated the violence that was required to break through the police line as shown in Exhibit 1. Exhibit 1 reveals Rau screaming "we have you surrounded!" towards police officers who were outnumbered by at least a hundred to one, and who were engaged in hand-to-hand combat with rioters attempting to break the line. Jancart can be heard laughing in the video. By posting the video to Facebook, he clearly sponsored the content. While Jancart himself did not participate in that physical attack, he stood by while Rau screamed threatening language to police officers and celebrated the violence. Someone – possibly Jancart, himself – can be heard yelling "get him!" on the video. When the line is broken, Rau and Jancart start screaming, "go, go, go!" and "they just pushed through the guards!" Exhibit 1 encapsulates

Jancart and Rau's posture on that day – they encouraged and celebrated the violence, and then capitalized on it by unlawfully entering the Capitol in its wake.

Jancart's posting of the video, Exhibit 1, to Facebook, demonstrates that he wanted to share with others that the police were outnumbered and overcome by the rioters.

Jancart entered the building approximately five minutes after it was first breached at his location of entry. While no police officers blocked his path, there were clear signs of violent entry. The window adjacent to the door through which Jancart passed had just been smashed out. Jancart and Rau walked directly by a pile of shattered glass on the ground as they moved deeper into the U.S. Capitol. They would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. They were aware that tear gas had been deployed. Jancart and Rau did not stop at the Rotunda, but instead moved deeper into the U.S. Capitol until they came all the way to the conference room of the Speaker of the House. They were undeterred by other rioters shouting, "shit on her desk" and instead continued even further into the U.S. Capitol until they encountered police officers who specifically told them to leave and, based on the video footage, physically placed a hand on Erik Rau in order to escort him out of the building.

Jancart's statements after January 6 show a total lack of remorse. When he was interviewed by the FBI, he was defiant and repeatedly stated that he had a right to enter the U.S. Capitol because he paid taxes. He also claimed that a police officer waved him into the building – a claim for which there is no support in the evidence uncovered during the government's investigation of Jancart.

Jancart's statements on social media during and after the attack similarly demonstrate a lack of remorse. Jancart admitted to being one of the "first 50-100 people in the place" and described his conduct as having "stormed the Capitol." Jancart admitted that tear gas had been

deployed. Jancart and the others who first breached the U.S. Capitol bear a special responsibility for this unparalleled crime because they emboldened the rioters who came behind them and were therefore each vitally important and thus responsible for the large crowd that overwhelmed the police officers through both violence and also sheer numbers.

Jancart explained on Facebook that the purpose was to "let the politicians know we can get this far anytime we want[.]" This statement illuminates Jancart's intent on January 6 but also reveals the potential for future violence from this defendant. Jancart also made reference to the start of a "revolution" and stated that it was "better to get it over with sooner than later, it's always harder later." Jancart's own words demonstrate a very real possibility of future violence in the name of "revolution," and impel the government to seek a significant jail sentence in this case.

Finally, Jancart almost certainly destroyed evidence after the riot. The FBI was unable to locate Exhibit 1 on Jancart's phone, although it was seized from his Facebook account, and the FBI identified large gaps in the text message thread between Jancart and Rau for the time period around January 6.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  The History and Characteristics of the Defendant**

As set forth in the PSR, Derek Jancart's criminal history consists of a misdemeanor conviction for Operating a Vehicle while Impaired (Alcohol and/or Drugs) and several traffic infractions. ECF 22 ¶¶ 25-29. Jancart reported to the PSR writer that he enlisted in the U.S. Air Force in April 2003 and was honorably discharged in 2007. The defendant advised the PSR writer that while enlisted, he served in Afghanistan for five and a half months in 2007 and in South Korea for three and a half months in 2007. Jancart was employed as a full-time steelworker from

December 2013 until the present but was laid off from approximately April/May 2020 until May 2021, during which time he received unemployment benefits. Jancart has been compliant with his conditions of pre-trial release.

While Jancart's military service is laudable, it renders his conduct on January 6 all the more egregious. As a former military member, Jancart was well aware that taxpayer status does not bestow upon a person the right to enter restricted government buildings. His voluntary decision to storm a guarded government building is nothing short of shocking in light of his former military service and training. His repeated assertions that he had a right to enter based on paying taxes is not credible – certainly, as an active service member he did not allow civilians onto restricted military basis on the basis that they "paid taxes." In this case, Jancart's former military service makes his conduct on January 6 all the more egregious and demonstrates a very real need for specific deterrence in the form of incarceration.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. at 3 ("As to probation, I don't think anyone should start off in these

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected.") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Derek Jancart's words, post-arrest interview, and statements on social media clearly demonstrate the need for specific deterrence for this defendant. Jancart celebrated the violence of the day after January 6 by posting Exhibit 1, a video where he and Erik Rau cheered the rioters breaking through the police line. After the attack, Jancart repeatedly asserted on Facebook that the media was lying and while downplaying the violence of the day, comparing it to Black Lives Matters protests, and claiming that "cops were letting people in so I don't know how they can be all that pissed[.]" This is flatly untrue as Jancart well knows. Jancart cheered the crowd that broke through the police line; he celebrated the violence by posting Rau's video to Facebook where Rau screamed "we have the police surrounded," he walked past shattered glass on the floor of the Capitol when he unlawfully entered with a horde of rioters, he knew the police had deployed tear gas, and he ignored the blaring alarm resonating through the Capitol. Knowing all this, Jancart used Facebook and his own presence at the riot to spread false propaganda that the media coverage was false and that it was a "peaceful" protest. It was not. Indeed, Jancart also admitted on Facebook that he was one of the first "50-100 people in the place" and that he and others "stormed the capitol[.]" By his own words, Jancart talked of a "revolution" and admitted that he and the other rioters intended to "let the politicians know we can get this far anytime we want[.]"

As of the date of this filing, Jancart has not expressed remorse. When interviewed by the FBI at the time of his arrest, he repeatedly asserted that he had a right to be at the Capitol because he paid taxes. On Facebook, he claimed that all he did was "trespass" on public grounds that he had "sent literally hundreds of thousands of dollars to over my lifetime." The government acknowledges that the Defendant accepted responsibility early by entering into this plea agreement. On the other hand, the Defendant's failure to acknowledge the dangers and violence of January 6, 2021, his repeated assertion that his alleged compliance with the U.S. tax laws entitled him to storm the Capitol,[5] his spreading of false propaganda relating to the attack on the Capitol, and his lack of remorse underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default. Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because

---

[5] The government notes that despite repeatedly asserting that his taxpayer status entitled him to unlawfully enter the Capitol, the defendant did not comply with the PSR writer's request to provide his tax returns and he admitted to filing to file a federal income tax return for tax year 2020.

it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19.

　　While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the former category. The defendant came to D.C. prepared with a gas mask, converged on the Capitol after learning it was "breached," spent 40 minutes inside the Capitol and penetrated all the way to the Speaker's conference room, celebrated the violence required to breach the Capitol, showed no remorse when arrested by the FBI, spread false information on social media, believes a revolution is coming, and stated that the intend of the riot was to "let the politicians know we can get this far anytime we want," revealing a very real threat of future violence. Thus, this defendant should not be compared to those who obtained a home confinement or probationary sentence.

　　Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentence to be imposed on Erik Rau. As of the filing of this memorandum, Derek Jancart is scheduled to be sentenced immediately prior to Erik Rau. Although they participated in the Capitol Riot together, there are some important differences between Jancart and Rau. Rau's conduct on January 6 was more egregious than Jancart's, as revealed by Exhibit 1: it was Rau who screamed "we have you surrounded!" towards the police officers and screamed "go, go, go!" and "yeah, they

just pushed through the guards!" These threatening statements are akin to inciting a riot and contributed to the environment of terror on that day. On the other hand, Jancart posted the same video to Facebook, essentially sponsoring the dissemination of its content, and he can be heard laughing and cheering in the video. Further, multiple search warrants in this case did not reveal the kind of propaganda and minimization of the violence by Erik Rau that appear in Derek Jancart's Facebook account. Finally, Erik Rau turned himself in immediately after Jancart's arrest and voluntarily provided a proffer, his clothing, as well as his cell phone. However, Rau only turned himself in *after* learning that Derek Jancart had been arrested and his home searched by federal agents. Erik Rau's proffer was substantially more conciliatory and remorseful than the interview provided by Derek Jancart at the time of his arrest. Both Erik Rau and Derek Jancart both accepted the first plea offer extended to them, rendering them some of the first Capitol Riot defendants to plead guilty. Accordingly, although Rau's conduct on January 6 was more egregious than Derek Jancart's based on the conduct captured in Exhibit 1, his conduct after Derek Jancart's arrest – both his cooperation with the prosecution and lack of social media postings – is sufficiently mitigating that the government is recommending a sentence of four months' incarceration for both defendants.

At this time, no unwarranted sentencing disparities exist, nor does the government's request create one.

## V.    Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Derek Jancart to four months' incarceration and $500 in restitution. Such a

sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:  LESLIE A. GOEMAAT
MA Bar No. 676695
Assistant United States Attorney
Fraud Section
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Office: 202-803-1608
Leslie.Goemaat@usdoj.gov